# APPENDIX  A
# TO BRIEF OF
# APPELLEE OFFICIAL COMMITTEE
# OF UNSECURED CREDITORS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x

THE UNOFFICIAL ON-SHORE      :
CREDITORS' COMMITTEE OF THE      :
BAYOU FAMILY OF COMPANIES,      :         No.: 7:06-cv-02379-UA
     :
                Plaintiff,      :
     :
v.      :
     :
BAYOU GROUP, LLC, *et al.*,      :
     :
                Defendants.      :
------------------------------------------------------x

**THE UNOFFICIAL ON-SHORE CREDITORS' COMMITTEE'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO APPOINT**
**A RECEIVER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................ 2

    A.   *The Bayou Fraud* ............................................................................................ 2

    B.   *Government Seizures and Criminal Charges* .................................................. 4

        1.   *The Arizona Attorney General Seizure of Assets* ....................................... 4

        2.   *U.S. Attorney's Civil Action Against Bayou Entities* ................................. 5

        3.   *SEC and CFTC Civil Actions* ..................................................................... 6

        4.   *U.S. Attorney's Criminal Actions Against Israel and Marino* ................... 7

        5.   *Off-Shore Bayou Creditors' Bankruptcy Filing and Limited Stay* ............. 8

    C.   *This Court's Appointment of the Kroll Receiver* ............................................ 9

    D.   *Unofficial Bayou On-Shore Creditors' Committee* ...................................... 10

    E.   *Notice Regarding this Motion* ...................................................................... 12

III.  ARGUMENT ......................................................................................................... 13

    A.   *The Committee Has Standing to Petition this Court for a Receiver* ............. 13

    B.   *The Facts Merit an Appointment of a Receiver* ............................................ 15

        1.   *The Bayou Principals Have Admitted they Perpetrated a Widespread Fraud with the Bayou Hedge Funds* ...................................................... 17

        2.   *This Court's Appointment of a Receiver is Necessary to Preserve the Value of Any Remaining Bayou Assets for All Bayou Creditors* ............ 17

        3.   *This Court's Appointment of a Receiver will not Prejudice Any Entity and Denial of a Receiver Will Prejudice Bayou Creditors* ....................... 19

        4.   *This Court Should Grant the Receiver All Necessary Authority to Protect the Interests of the On-Shore Creditors* ......................................... 19

            a.   *The Receiver Requires Broad Powers to Fulfill His Responsibilities* .................... 20

   *b.* ***The Proposed Receiver Will Not Interfere with Any Government Law Enforcement Interest*** .......................................................................... 21

   *c.* ***This Court Should Approve the Committee's Requested Receiver*** ........................ 21

**IV.** **CONCLUSION** .............................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Auto Workers v. Brock*, 477 U.S. 274, 106 S. Ct. 2523 (1986) ................................................ 14, 15

*Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S. Ct. 229 (1940) .......................... 15-16

*Drob v. National Memorial Park, Inc.*, 41 A.2d 589 (Del. Ch. 1945) ........................................ 15

*Federal Home Loan Mortgage Corp. v. Tsinos*, 854 F. Supp. 113 (E.D.N.Y. 1994) ................... 20

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 97 S. Ct. 2434 (1977) ................ 13, 14

*In re Manhattan Inv. Fund. Ltd.*, 310 B.R. 500 (Bankr. S.D.N.Y. 2002) ..................................... 20

*ITT v. Vencap*, 411 F.Supp. 1094 (S.D.N.Y. 1975) ....................................................................... 16

*Mony Group, Inc. v. Highfields Capital Management, L.P.*, 368 F.3d 128 (2d Cir. 2004) ........ 16n

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S. Ct. 1163 (1958) ............................... 13

*SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) ............................................... 15

*SEC v. Credit Bancorp, Ltd.,* 297 F.3d 127 (2d Cir. 2002) ........................................................... 20

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ........................................... 15

*The Republic of the Philippines v. Marcos*, 653 F.Supp. 494 (S.D.N.Y. 1987) .......................... 16

*United Food & Commercial Workers Union v. Brown Group, Inc.*, 517 U.S. 544,
    116 S. Ct. 1529 (1996) ............................................................................................................ 13

*Varsames v. Palazzolo*, 96 F.Supp 2d 361 (S.D.N.Y. 2000) ....................................... 15, 16, 16n

*Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197 (1977) ................................................................. 15


**Statutes**

28 U.S.C. § 754 .............................................................................................................. 19-20, 20n

28 U.S.C. § 959 .............................................................................................................. 19-20, 20n

**Rules**

Federal Rule of Civil Procedure 66 ............................................................................. 16

**Treatises and Law Review Articles**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2983
    (2d. ed. 1997) ............................................................................................ 16, 16n, 19

George W. Dent, Jr., *Ancillary Relief in Federal Securities Law: A Study in Federal
    Remedies*, 67 Minn. L. Rev. 865 (1983) ............................................................. 15

# I.  INTRODUCTION

The Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies ("Committee") seeks appointment of Jeff J. Marwil as a receiver with the authority to identify creditors and assets of the Bayou Group and Bayou Management, LLC (collectively, "Bayou"), evaluate and liquidate claims of the estates against third parties, and develop a plan to distribute the proceeds.

For the last nine years, Bayou and the Bayou family of funds ("Bayou Funds" or "Funds") have been used systematically to bilk fund investors by falsifying investment performance (resulting in the payment of fraudulent performance fees to the Bayou principals) and facilitating the misappropriation of fund assets by the Bayou principals.  Since May 2005, various state and federal agencies, as well as the Bayou investors, have worked cooperatively to prosecute the offenders and to try to mitigate the damage that the Defendants have caused. These efforts have been productive: the two individuals most responsible for perpetrating this fraud have pleaded guilty to multiple felonies, their personal assets have been forfeited, and this Court has appointed a representative of Kroll, Inc. as a receiver to aid the United States Marshal in liquidating them; the government has seized approximately $100 million in Bayou assets; and liquidators affiliated with Kroll, Inc. ("Kroll Liquidators") are liquidating any assets of the Bayou Off-Shore funds in proceedings pending in the Cayman Islands.  *In re Bayou Off-Shore Master Fund, Ltd., et al.*, Nos. [2005] 397 etc. (Cayman Is. Grand Ct., September 2, 2005) (Cayman Islands).

The status quo is that much of the known Bayou related assets are the subject of orders of civil or criminal forfeiture entered on behalf of the State of Arizona and the United States. There is a fiduciary in place to protect the interests of Off-Shore creditors. But there is no one with the power and obligation to protect the interests of On-Shore creditors.

The Committee believes the immediate appointment of a receiver with the equitable power to carry out such tasks is necessary to remedy the Bayou principals' fraud affecting the On-Shore Bayou entities. That receiver should be charged with identifying the Bayou On-Shore creditors, investigating and evaluating the disposition of Bayou assets and the claims of the estates, liquidating such claims as appropriate against third parties, and developing a plan to distribute the proceeds. Before any distribution plan can be finalized, the On-Shore creditors need a representative to negotiate and resolve with his counterparts, the Kroll Liquidators appointed by the Cayman Islands court, issues relating to the allocation of any commingled assets between the On-Shore and Off-Shore funds. The Committee's proposed receiver would thus have responsibilities very different from the charge granted to the Kroll Receiver this Court appointed to administer the forfeited assets.

The On-Shore Creditors' Committee believes that a receiver selected by its constituents and appointed at its request is in the best position to protect the interests of the victims of the Bayou fraud. To that end, the Committee asks the Court to defer to its choice of a candidate, and the compensation package it has negotiated with him.

## II.    STATEMENT OF FACTS

### A.    *The Bayou Fraud.*

Bayou operated its family of Hedge Funds from 1996 to 2005, when it announced the voluntary liquidation of those funds. From 1998, if not earlier, to their termination, these funds

were operated as a fraudulent investment scheme. Over the course of this fraud, Bayou induced

investors to deposit a reported amount of over $450 million in the Bayou Funds, despite

consistent and substantial losses, in what was, in essence, a sophisticated Ponzi scheme: Bayou

created false profit reports and audits to attract new investors and retain existing investors, and

used the incoming capital to continue operations and pay the redemptions of investors who

sought to exit the hedge funds. Gershman Dec.[1] Exhibits ("Exs.") A [Allocution, *United States

v. Israel*, No. 7:05-cr-1039-CM (S.D.N.Y. Sept. 29, 2005) ("Israel Allocution")] at 15:14–17:16,

24:10–24 & B [Allocution, *United States v. Marino*, No. 7:05-cr-1036-CM (S.D.N.Y. Sept. 29,

2005) ("Marino Allocution")] at 17:9–19:15, 27:19–28:16. Unbeknownst to investors, Bayou

lost tens of millions of dollars over the course of its nine-year history while Bayou's principals,

defendants Samuel Israel, III ("Israel") and Daniel E. Marino ("Marino"), paid themselves

substantial performance fees based on these fictitious profits, and enjoyed large commissions on

undisclosed trading losses through Bayou affiliated broker-dealers, including defendant Bayou

Securities, LLC. *See generally* Gershman Dec. Exs. A [Israel Allocution] at 15:14–17:16,

24:10–24 & B [Marino Allocution] at 17:9–19:15, 27:19–28:16. The Bayou scheme was not

uncovered until August of 2005, when Bayou investors discovered it and alerted the government

about the nature and scope of the Bayou fraud. *See generally* Gershman Dec. Exs. A [Israel

Allocution] at 15:14–17:16, 24:10–24] & B [Marino Allocution] at 17:9–19:15, 27:19–28:16];

Fisher Dec. at ¶¶ 2–3.[2] Bayou's principals have now pleaded guilty to multiple counts of

---

[1] "Gershman Dec." refers to the Declaration of Joseph A. Gershman in Support of Creditors' Committee Motion to Appoint a Receiver, filed concurrently with this Motion.

[2] "Fisher Dec." refers to the Declaration of Jonathan J. Fisher in Support of Creditors' Committee Motion to Appoint a Receiver, filed concurrently with this Motion.

investment adviser fraud, wire fraud, mail fraud, and conspiracy.  Gershman Dec. Exs. A [Israel

Allocution] at ¶¶ 21:10–22:24] & B [Marino Allocution] at 24:4–26:8.

**B.**    ***Government Seizures and Criminal Charges.***

Since Bayou's collapse in August 2005, government agencies have filed charges against

the Bayou entities and their Bayou principals, and have obtained forfeiture orders relating to the

Bayou assets.  While these government actions contemplate collecting and distributing forfeited

assets to victimized investors, the government has elected not to pursue claims on behalf of the

Bayou entities against certain third parties and has not yet determined how the forfeited assets

will be distributed to investors.  Below is a brief summary of the various actions initiated by

government entities.

**1.**    ***The Arizona Attorney General Seizure of Assets.***

On May 19, 2005, the Arizona Attorney General sought the seizure of approximately

$100 million in a Commerce Bank account held under the name of Majestic Capital

Management.  *See* Gershman Dec. Ex. C [Application for Order of Forfeiture, *In the Matter of:*

*the Proceeds of Wachovia Corp. Direct Deposit Account Nos. 2000026084477, 2000026090429,*

*and 2000026096326, in the name of Majestic Capital Management*, No. CV 2005-008698

(Super. Ct. Ariz. Sept. 26, 2005) ("Arizona AG Forfeiture")] at 1.  Beginning in early 2004,

Bayou liquidated its trading accounts in order to invest in a series of fraudulent "high yield"

international banking transactions.  Complaint (Docket No. 1), *United States v. All Assets of*

*Bayou Accredited Fund, LLC*, 7:05-cv-07722-CM (S.D.N.Y. Sept. 1, 2005) at ¶¶ 12-14.   In

those transactions, Bayou transferred approximately $150 million in assets to multiple banks

across Europe.  Complaint (Docket No. 1), *United States v. All Assets of Bayou Accredited Fund,*

*LLC*, 7:05-cv-07722-CM (S.D.N.Y. Sept. 1, 2005) at ¶ 14.  Further, government officials have

4

asserted that Bayou contracted with Majestic to invest the funds in supposed "high yield" investment schemes on Bayou's behalf.  Complaint (Docket No. 1), *SEC v. Israel*, No. 7:05-cv-08376-CM (S.D.N.Y. Sept. 29, 2005) ("SEC Complaint") at ¶ 36.  The Arizona Attorney General, acting under Arizona law, suspected these funds were a part of an illegal "prime bank" financial scheme and seized the remaining assets.  *Id.* at ¶ 37.  By this time, those assets had been reduced to $100 million.  *Id.*  The Arizona state court entered a final order of forfeiture on September 28, 2005.  Gershman Ex. I [Order of Forfeiture, *In the Matter of: the Proceeds of Wachovia Corp. Direct Deposit Account Nos. 2000026084477, 2000026090429, and 2000026096326, in the name of Majestic Capital Management*, No. CV2005-008698 (Super. Ct. Ariz. Sept. 28, 2005)].  Majestic and Bayou initially contested the seizure, but Bayou's attorney later withdrew from the representation.  Gershman Dec. Ex. D [Order Granting Motion to Withdraw as Counsel of Record for Claimant Bayou Fund, LLC, *In the Matter of: the Proceeds of Wachovia Corp. Direct Deposit Account Nos. 2000026084477, 2000026090429, and 2000026096326, in the name of Majestic Capital Management*, No. CV2005-008698 (Super. Ct. Ariz. Sept. 6, 2005)].  Majestic continued to assert claims to the forfeited assets, but it failed to appear at an Arizona hearing scheduled for February 24, 2006.  Gershman Dec. Ex. H [Minute Order, *In re the Matter of Arizona State*, No. CV 2005-008698 (Super. Ct. Ariz. Feb. 17, 2006)].

    **2.**    ***U.S. Attorney's Civil Action Against Bayou Entities.***

On September 1, 2005, the United States filed a verified civil complaint against all Bayou assets seeking, among other things, forfeiture of the approximately $100 million of Bayou assets seized by the Arizona Attorney General.  Complaint (Docket No. 1), *United States v. All Assets of Bayou Accredited Fund, LLC*, 7:05-cv-07722-CM (S.D.N.Y. Sept. 1, 2005) at ¶¶ 17–24.  The same day the United States' complaint was filed, this Court issued an *in rem* arrest warrant,

permitting the United States Marshals office to attach and detain the $100,010,673.68, in the possession of the Arizona Attorney General when and if the Arizona state court's jurisdiction was terminated. Warrant for Arrest of Article In Rem (Docket No. 2), *United States v. All Assets of Bayou Accredited Fund, LLC*, No. 05-CIV-7722 (S.D.N.Y. Sept. 1, 2005). Since this Court's entry of the *in rem* arrest warrant, the United States has not taken any further action to pursue forfeiture of the Bayou assets in the civil action because that action has been superseded by events in related criminal actions. *See* Section B.4. *infra*.

### 3.    *SEC and CFTC Civil Actions*.

On September 29, 2005, both the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") filed separate law enforcement actions against various Defendants in this action together with other Bayou entities, alleging violations of numerous laws and rules enforced by the respective agencies. *See* SEC Complaint; Complaint (Docket No. 1), *CFTC v. Bayou Management, LLC*, No. 7:05-cv-08374-CM (S.D.N.Y. Sept. 29. 2005). On the same day, this Court signed stipulated orders in both cases granting injunctions against the Bayou defendants prohibiting them from further violating the laws alleged to have been violated in the respective complaints. Stipulation and Order Granting Preliminary Injunction Freezing Assets and Appointing Receiver (Docket No. 3), *SEC v. Israel*, No. 7:05-cv-08376-CM, (S.D.N.Y. Sept. 29, 2005) ("SEC Receiver Order"); Order for Preliminary Injunction and Other Equitable Relief (Docket No. 4), *CFTC v. Bayou Management, LLC*, No. 7:05-cv-08374-CM (S.D.N.Y. Sept. 29. 2005) ("CFTC Receiver Order"). While the SEC and CFTC

initially asked this Court to appoint a receiver, the United States objected to those requests.[3]  The

CFTC recently filed a motion for default against Marino and Richmond- Fairfield.

### 4.    *U.S. Attorney's Criminal Actions Against Israel and Marino.*

On September 29, 2005, the United States filed separate criminal actions against the

Bayou principals, Israel and Marino, alleging investment advisor fraud, mail fraud, and

conspiracy to commit the same.  Information (Docket No. 1), *United States v. Israel*, No. 7:05-

cr-1039-CM (S.D.N.Y. Sept. 29, 2005) ("Israel Information"); Information (Docket No. 1),

*United States v. Marino*, No. 7:05-cr-1036-CM (S.D.N.Y. Sept. 29, 2005) ("Marino

Information").  Israel and Marino pleaded guilty to all charges that day.  Gershman Dec. Exs. A

[Israel Allocution] at 21:10–22:24 & B [Marino Allocution] at ¶¶ 24:4–26:8.  The Informations

filed against Israel and Marino included a forfeiture allegation stating that each defendant "shall

forfeit to the United States pursuant to 18 U.S.C. §981(a)(1)(C) and 28 U.S.C. §§ 2461, all

property, real and personal, that constitutes or is derived from proceeds traceable to the

commission of the offense, including … [a]pproximately $100,010,673.68" forfeited by the

Arizona Attorney General.  Israel Information at ¶ 14; Marino Information at ¶ 17.[4]  This Court

subsequently issued separate Preliminary Forfeiture Orders against Israel and Marino, stating

that "all of the defendant's right, title and interest in the Forfeited Property is hereby forfeited to

---

[3]  The SEC and CFTC's proposed orders included sections appointing a receiver, which were
struck by this Court.  *See* SEC Receiver Order at ¶ 10; CFTC Receiver Order at § V.

[4]  The Informations were sweeping in the breadth of the contemplated forfeiture, and specified:
"all property, real and personal, that constitutes or is derived from proceeds traceable to the
commission of the offense, including, but not limited to, a sum of money equal to $450,000,000,
representing the amount of proceeds obtained as a result of the mail fraud conspiracy offenses
alleged in Counts One and Three of this Information, for which the defendant and his co-
conspirators are jointly and severally liable." Israel Information at ¶ 14; Marino Information at ¶
17.

the United States...."  Preliminary Order of Forfeiture/Final Order of Forfeiture as to Samuel

Israel, III (Docket No. 12), *United States v. Israel*, No. 7:05-cr-1039-CM (S.D.N.Y. Oct. 20,

2005) ("Israel Forfeiture"); Preliminary Order of Forfeiture/Final Order of Forfeiture as to

Daniel Marino (Docket No. 12), *United States v. Marino*, No. 7:05-cr-1036-CM (S.D.N.Y. Oct.

20, 2005) ("Marino Forfeiture").

   Both Preliminary Forfeiture Orders described the approximately $100 million as included

within the "Forfeited Property."  Israel Forfeiture at 2; Marino Forfeiture at 2.

   5.   ***Off-Shore Bayou Creditors' Bankruptcy Filing and Limited Stay.***

   On September 1, 2005, following the widely publicized Bayou collapse, seven Bayou

Off-Shore Funds petitioned the Cayman Islands' Grand Court to appoint liquidators to wind

down the Off-Shore Funds, which had apparently taken investor assets and invested them in the

On-Shore Bayou Funds.  Gershman Dec. Ex. E [Motion of Gordon I. Macrae and James G.

Cleaver for Order Directing Joint Administration of Section 304 Cases, *In re Petition of Macrae*,

Lead Case No. 05-51154, Jointly Administered Case Nos. 05-51154–05-51160 (Bankr. D. Conn.

September 9, 2005) ("Joint § 304 Motion")] at ¶ 3.[5]  The Grand Court appointed Gordon I.

Macrae and G. James Cleaver of Kroll (Cayman) Ltd. (the "Kroll Liquidators") as the Off-Shore

Funds liquidators, charging them with protecting the interests of the Bayou Off-Shore Funds'

creditors, investors, and shareholders.  *Id.* at ¶¶ 6–7.  The Kroll Liquidators subsequently filed an

ancillary petition under Section 304 of the Bankruptcy Code in the United States Bankruptcy

---

[5]  In October and November 2003, Defendants Israel and Marino created a number of Cayman
Island Hedge Funds commonly referred to as the Off-Shore Bayou Funds.  Gershman Dec. Ex. E
[Joint § 304 Motion] at ¶ 3.  It appears that the Bayou Off-Shore Funds served as feeder funds
for the Bayou Off-Shore Master Fund, which in turn sent funds to Bayou Management for
investment in the Bayou [On-shore] Funds.  Gershman Dec. Ex. F [First Affidavit of Gordon Iain
Macrae (attached as Exhibit A to Affidavit of Gordon Iain Macrae, *In re Petition of Macrae*,
Lead Case No. 05-51154, Jointly Administered Case Nos. 05-51154–05-51160 (Bankr. D. Conn.
September 8, 2005)] at ¶ 6.

Court for the District of Connecticut.  *See* Gershman Dec. Ex. E [Joint § 304 Motion] at ¶¶ 8–15. The Kroll Liquidators sought bankruptcy court protection to aid their efforts to effectuate an orderly liquidation of the Bayou Off-Shore entities in the Cayman Islands.  As part of that effort, the bankruptcy court granted the Kroll Liquidators' request to stay the "commencement or continuation of any judicial, arbitral, administrative, or regulatory action or proceeding involving the [Bayou Off-Shore Funds] or any property in which the [Bayou Off-Shore Funds] have an interest."  Gershman Dec. Ex. G [Order for Preliminary Injunction and Granting of Petitions Under Section 304, *In re Petition of Macrae*, Lead Case No. 05-51154, Jointly Administered Case Nos. 05-51154–05-51160 (Bankr. D. Conn. Oct. 5, 2005)] at 9.  The injunction, however, excluded any person from asserting claims against any On-Shore Bayou entity or its property, such as that which is the subject matter of this Motion.  *Id.* at 7–9.

**C.    *This Court's Appointment of the Kroll Receiver.***

On January 6, 2006, the United States filed a motion with this Court seeking to appoint Jim Shinehouse of Kroll, Inc. as "receiver to assist the United States Marshals Service ('USMS') in effecting the liquidation of the property forfeited" in the criminal actions against Israel and Marino.  *See generally* Government's Application for Appointment of Receiver, *United States v. Marino*, No. 7:05-cr-1036-CM (S.D.N.Y. Jan. 6, 2006) ("Consolidated Receiver Application"). This Court's subsequent Order appointing the Kroll Receiver provides that:

> At and under the direction of the USMS, the Receiver is authorized and directed to assist in (i) effecting the liquidation of the Forfeited Property, including but not limited to private placements and other investments of partnerships; (ii) transferring stock; (iii) seeking stays of civil litigation affecting Forfeited Property; and (iv) collecting loans and purported loans made by the defendant(s) and/or any entities or partnerships held by or for the benefit of the defendant(s).

Order Appointing Receiver, *United States v. Marino*, No. 7:05-cr-1036-CM (S.D.N.Y. Jan. 6, 2006) ("Consolidated Receiver Order") at 2–3.

Notably, while the Kroll Receiver is authorized to collect and liquidate certain forfeited assets, he is not tasked with identifying and soliciting creditor claims or evaluating possible claims of the estate. While the government has broad authority in such circumstances, the Kroll Receiver has not been delegated the authority to prosecute claims against third parties, to develop a plan to distribute forfeited assets, or to return monies collected from third parties to Bayou investors. *See generally id*. In essence, the Kroll Receiver's role is limited to collecting and protecting forfeited assets.

**D.**     ***Unofficial Bayou On-Shore Creditors' Committee.***

In February 2006, following broad notice to similarly situated Bayou investors—including notice to victims sent by the U.S. Attorney's Office[6]—the Bayou creditors formed the Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies. Fisher Dec. at ¶ 4. While it has had no access to Bayou's records, the Committee has initiated contact with any entity that it has determined might have an interest in any of the Bayou Funds, including the Off-Shore creditors and the Kroll Liquidators.[7] *Id*. at ¶ 5. All creditors were invited to submit information about their Bayou holdings, and were invited to participate in the Committee's formation decisions. *Id*. at ¶¶ 5–6. Creditors representing in excess of $109 million in claims against one or more of the Bayou Funds have participated in the Committee's formation and deliberations. *Id*. at ¶ 6. Ultimately, the creditors decided that the voting members of the Committee would be the seven largest creditors willing to serve. *Id*. Currently, the Committee's voting members comprise the five largest Bayou On-Shore creditors willing to serve, and the

---

[6] At the request of one of the creditors, the United States Attorney provided direct notice of the Committee formation to investors. Fisher Dec. at ¶ 5.

[7] The Committee has worked in close cooperation with the Kroll Liquidators, and intends to cooperate with a committee currently being formed in the Cayman Islands to represent similarly situated Off-Shore creditors.

Committee's voting members collectively have claims in excess of $60 million against the

Bayou Funds. *Id.* Other creditors who have expressed an interest in participating in the

Committee deliberations but who are unwilling to serve as voting members are invited to attend

Committee meetings on an *ex officio* basis. *Id.* In this way, the Committee believes it has a basis

to assert the interests of injured creditors generally in this action.

The Committee's purpose is set forth in its By-laws which state, in relevant part, that the

Committee shall:

> (1) Evaluate the need to seek support for and implementation of a process for
> judicial appointment of a receiver/trustee to marshal assets and make distributions
> to creditors;
>
> (2) Evaluate prospects and make recommendation for the selection of a
> receiver/trustee;
>
> (3) Monitor and work with the receiver/trustee or other fiduciary acting on
> behalf of the creditors to facilitate an efficient and timely forensic investigation,
> pursuit of claims, and, if appropriate, the commencement of a bankruptcy
> proceeding;
>
> (4) Negotiate and formulate a liquidation plan to facilitate prompt distribution
> of Debtor's assets with an adequate reserve to finance the pursuit of additional
> assets, including claims of the Debtor or the Debtor's creditors [].

Fisher Dec. Ex. B [By-laws of the Unofficial On-shore Creditors' Committee of the Bayou

Family of Companies ("Committee By-laws")] at Art. II.

The Committee has determined that this Motion is in the best interest of On-Shore

creditors and has engaged in a comprehensive selection process to identify, interview, and

evaluate potential receivers that may assist the Bayou On-Shore creditors, and this Court. Fisher

Dec. at ¶ 8. The Committee's process included the review of qualifications of possible

candidates followed by interviews with and due diligence review of six separate candidates. *Id.*

The Committee unanimously selected and recommends Jeff J. Marwil as its proposed receiver. *Id.*; *see also* Fisher Dec. Ex. C. [Resume of Jeff. J. Marwil].

The Committee has negotiated a specific compensation package with Mr. Marwil that it believes is fair and reasonable in light of the tasks to be undertaken. Fisher Dec. at ¶ 10. Specifically, the Committee proposes a compensation package as follows:

> the greater of (a) $20,000 per month from the date of his appointment until the final order winding up the receivership, or (b) 2% of the net amount of funds distributed under the Receiver's Plan, <u>provided that</u> in determining the net amount of funds distributed under the Receiver's Plan, any assets that are distributed under the Receiver's Plan directly or indirectly that are the subject of an order of forfeiture by the government, including without limitation the approximately $100 million that the Arizona Attorney General previously seized, shall not be considered.

Proposed Order Granting the Unofficial On-Shore Creditors' Committee's Motion to Appoint a Receiver ("Proposed Receiver Order") at ¶ 9. The Committee has reached this proposal after arms-length negotiations with Mr. Marwil, and believes the compensation provides an appropriate mix of fair compensation and incentives to ensure Mr. Marwil aggressively pursue third party claims. *Id.* ¶ 10.

**E.    *Notice Regarding this Motion.***

The Committee is providing notice of this Motion to the United States Attorney's Office for the Southern District of New York, the SEC, the CFTC, the Arizona Attorney General's Office, the Kroll Liquidators[8], the Kroll Receiver, the registered agents of the Bayou Group, Marino and Israel (through counsel), and all Bayou On-Shore investors of which the Committee is aware.

---

[8] The Kroll Liquidators have been given notice of this Motion and we are informed by their counsel that the Committee's proposed receivership order does not violate the terms of the Connecticut bankruptcy court's section 304 injunction.

### III.    ARGUMENT

More than eight months have passed since the Bayou fraud was exposed, yet there is no fiduciary charged with identifying the Bayou creditors, investigating possible claims of the Bayou estates against third parties, liquidating such claims, and developing a plan to distribute the proceeds.  The Committee has standing to seek the equitable relief requested on its members' behalf.  The undisputed facts merit this Court's immediate appointment of a receiver. The Committee has undertaken extensive vetting of potential candidates and, on that basis, respectfully requests that this Court defer to its choice of Mr. Marwil as receiver, and approve the compensation package it has negotiated with him.

### A.    *The Committee Has Standing to Petition this Court for a Receiver.*

The Committee has standing to seek, on behalf of its members, the equitable relief demanded in the Complaint.[9]  An organization may have standing to assert its members' injuries in federal court.  *United Food & Commercial Workers Union v. Brown Group, Inc.*, 517 U.S. 544, 551–52, 116 S. Ct. 1529, 1533-34 (1996) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459, 78 S. Ct. 1163, 1170 (1958) "[the association] and its members are in every practical sense identical.").  The Supreme Court has articulated the test for associational standing:

> . . . an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).

---

[9] To the extent that there is any question about the Committee's standing to seek this relief, the members of the Committee are prepared to amend the Complaint to add one or more voting members as additional plaintiffs.

The Committee's By-Laws demonstrate that the Committee meets the first and second *Hunt* factors. The Committee consists of "members who are unsecured creditors of the On-Shore Debtor entities." Fisher Dec. Ex. B [Committee By-Laws] at Art. III, § 1. Each of these members has an interest in the Bayou assets and would otherwise have standing to bring this action in its own right. The Committee's purposes include identifying Bayou creditors and soliciting creditor claims, evaluating and liquidating claims of the estates and developing an equitable plan to distribute those assets. Similarly, the By-Laws explain that: "[t]he purpose of the Committee is to represent the interests of creditors holding unsecured claims against one or more of the On-Shore entities comprising the Bayou family of companies by facilitating the marshalling of assets of Debtor and prompt distributions to creditors." *Id*. at Art. II. This action seeks equitable relief in the form of a Court appointed receiver to identify and pursue claims and, ultimately, distribute the proceeds in the investors' best interests—interests wholly germane to the Committee's purpose.

The Committee also satisfies the third *Hunt* factor—i.e., that its individual members are not required participants in this action. In *Auto Workers v. Brock*, the Supreme Court held that a union had standing to challenge an agency interpretation of a statute denying benefits to thousands of union members. 477 U.S. 274, 292, 106 S. Ct. 2523, 2534 (1986). While the Court recognized that affected members' individual participation might eventually be required to distribute wrongfully withheld benefits, the lawsuit itself raised "a pure question of law," not requiring individual member participation:

> . . . though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Id.* at 288, 106 S. Ct. at 2532; *see also Warth v. Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 2213 (1977) (associational standing rests largely on the nature of the relief sought and approving prospective forms of relief). Here, the Committee seeks equitable relief—in the form of a Court-appointed receiver—that that will benefit all On-Shore creditors. *See* Proposed Receiver Order at ¶ 1.

**B.      The Facts Merit an Appointment of a Receiver.**

This Court has the authority, pursuant to the federal securities laws, state law, and the Federal Rules of Civil Procedure, to appoint a receiver as an equitable remedy. *See e.g. SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 443 (2d Cir. 1987) (holding that the district court did not abuse its discretion in appointing a receiver); *see also Varsames v. Palazzolo*, 96 F.Supp 2d 361, 365 (S.D.N.Y. 2000) (outlining a court's authority to appoint a receiver under Fed. R. Civ. P. 66); *see also Drob v. National Memorial Park, Inc.*, 41 A.2d 589, 597 (Del. Ch. 1945) (holding that Delaware state courts of equity have power to appoint receivers in cases of corporate fraud or breach of fiduciary duties).

Federal courts have broad powers to shape equitable relief in instances where federal securities laws have been violated. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). In addition to injunctions, federal courts have the power to grant a wide variety of equitable remedies including the appointment of receivers, the ordering of an accounting, and the restructuring of corporate management. *See e.g.* George W. Dent, Jr., *Ancillary Relief in Federal Securities Law: A Study in Federal Remedies*, 67 Minn. L. Rev. 865, 867 (1983) (outlining the various ancillary remedies federal courts have granted). While the SEC often requests a receiver in federal securities cases under its own authority, equitable remedies are equally available to private parties bringing claims for violations of federal securities laws. *See*

15

*Deckert v. Independence Shares Corp.* 311 U.S. 282, 287–88, 61 S. Ct. 229, 233 (1940); *see also ITT v. Vencap*, 411 F.Supp. 1094 (S.D.N.Y. 1975) (supplementing the court's basis for issuing an injunction in a private action brought under Section 10(b) and Rule 10b-5); *The Republic of the Philippines v. Marcos*, 653 F.Supp. 494, 499 (S.D.N.Y. 1987) (appointing a receiver at the request of the Republic of the Philippines); *cf.* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2983 (2d. ed. 1997) (any party with an equitable or statutorily protected property interest may seek appointment of a receiver).

Federal Rule of Civil Procedure 66 places the appointment of a receiver within this Court's sound discretion. *Varsames*, 96 F.Supp. 2d at 365. In assessing the appointment of a receiver, a court considers the following factors:

> [i] Fraudulent conduct on the part of the defendant; [ii] the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of available legal remedies; [iii] the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; [iv] and, in more general terms, the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Id.* (quoting Wright & Miller, *supra*, § 2983).[10] As demonstrated below, the record before this Court overwhelmingly supports these factors.

---

[10] The Court's appointment of a receiver constitutes pre-trial ancillary equitable relief where it is "clearly necessary to protect an interest by the plaintiff in property where the rights over that property are in dispute." *Varsames*, 96 F. Supp. at 365; *see also* Wright & Miller, *supra*, § 2981 (receiver appointed to manage assets and take "action with regard to the property pending its final disposition by the suit. . . . [Receiver's] appointment is incident to other proceedings in which some form of primary relief is sought."). As such, the criteria the Court considers when evaluating whether to appoint a receiver—from likelihood of success on the merits, to irreparable injury, to relative prejudice to either party—are substantially similar, albeit somewhat more stringent, to those applied to requests for injunctive relief. *Compare Varsames*, 96 F. Supp. 2d at 365 *with Mony Group, Inc. v. Highfields Capital Management, L.P.*, 368 F.3d 128, 143 (2d Cir. 2004) (preliminary injunction granted where plaintiff demonstrates "(1) that it will be irreparably harmed in the absence of an injunction, and, (2) either (a) a likelihood of success on the merits or

**1.     *The Bayou Principals Have Admitted they Perpetrated a Widespread Fraud with the Bayou Hedge Funds.***

The Bayou principals have admitted to operating a fraudulent scheme.  From 1998 through the Funds' 2005 collapse, Israel and Marino orchestrated a plan systematically to misrepresent the value of the Bayou Funds in order to attract new investors, lull existing investors into continuing their investments, pay themselves fraudulent performance fees, and maintain a platform to perpetuate their ongoing sham investment scheme.  Gershman Dec. Exs. A [Israel Allocution] at 15:14–17:16, 24:10–24 & B [Marino Allocution] at 17:9–19:15, 27:19– 28:16.  Defendants' fraud included, among other things, the creation of a fictitious accounting firm, distribution of numerous false financial statements, including "audits" performed by the sham accounting firm, and a plethora of other written and verbal misrepresentations made to Bayou investors.  Gershman Dec. Exs. A [Israel Allocution] at 15:14–17:16, 24:10–24 & B [Marino Allocution] at 17:9–19:15, 27:19–28:16.  In short, the Bayou Hedge Funds were a ruse that benefited the Bayou principals while defrauding investors of millions.

**2.     *This Court's Appointment of a Receiver is Necessary to Preserve the Value of Any Remaining Bayou Assets for All Bayou Creditors.***

The appointment of a receiver is necessary to mitigate the damage to the creditors resulting from the Bayou fraud.  As discussed in Section II.C above, while the Kroll Receiver was appointed to collect and preserve forfeited assets, there are critical tasks that the Kroll Receiver cannot—or should not—perform and that only an equitable receiver appointed by this Court for the benefit of On-Shore creditors can perform.  Consolidated Receiver Order at 2. These tasks include: (i) reviewing the Bayou books and records; (ii) identifying all entities with an interest in Bayou and assessing the multiple claims against the Funds on these investors'

(b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.").

behalf; (iii) evaluating and liquidating claims of the estate against third parties on behalf of the Funds and its investors, including claims against present and former Bayou investors that received partial or full redemptions, and Bayou payments of extraordinary non-existent returns to maintain the fraud; (iv) determining the extent, if any, to which proceeds from Off-Shore investors were commingled with proceeds from On-Shore Bayou creditors;[11] (v) negotiating a settlement with the Kroll Liquidators, or if negotiations fail, litigating the question of the proper allocation of Bayou assets between On-Shore and Off-Shore creditors; (vi) developing a plan to distribute subsequently recovered monies to defrauded Bayou investors; and (vii) coordinating with the government so that any distribution plan is consistent with any plan to distribute forfeited assets.

Timing is critical. The Committee estimates that On-Shore and Off-Shore creditors have sustained a combined loss of approximately $300 to $350 million—meaning that the receiver will have an enormous task in tracing and evaluating methods to recover the missing money. Fisher Dec. at ¶ 8. Further delays would be detrimental to the interests of the creditors. Investors who received partial or full early redemptions may be hard to identify, and the prosecution of any such causes of action will, in the best of circumstances, be difficult and time consuming. The evidence against third parties is getting stale and limitations periods continue to run on many of these claims. Thus, any further delay in appointing a receiver will irreparably harm all Bayou Creditors.

---

[11] It is readily apparent that the Kroll Receiver is conflicted from making recommendations to the Court as to this issue—an issue that has direct financial implications for his Cayman Islands' affiliate, the Kroll Liquidators. *See supra* section II.B(5).

3.    *This Court's Appointment of a Receiver will not Prejudice Any Entity and Denial of a Receiver Will Prejudice Bayou Creditors.*

The appointment of a receiver will not prejudice any party.  The Bayou principals, Israel and Marino, have already pleaded guilty to multiple felonies and have by their own admissions forfeited any legitimate right to control the Bayou entities.  As such, there is no current Bayou manager or representative that will be adversely affected by the appointment of a receiver.  As demonstrated in Section III.B.2 above, the proposed receiver's responsibilities would neither supersede nor interfere with those this Court granted to the Kroll Receiver.  Finally, while the Committee has sought the appointment of a receiver, the receiver will be accountable to this Court and will be working for the benefit of all creditors.  *See generally* Proposed Receiver Order.

In contrast, this Court's refusal to appoint a receiver will prejudice the Bayou creditors. The Kroll Receiver does not have, and cannot exercise, the necessary powers to protect the On-Shore creditors; the only two individuals that have ever managed Bayou are awaiting sentencing on various fraud charges and neither are engaged, inclined, nor able to assist in remedying the fiasco they masterminded; Bayou has no substitute executives or managers; and Bayou has yet to retain any individual or entity to assist it in winding up its business.  There is an immediate need for a receiver tasked with these responsibilities.

4.    *This Court Should Grant the Receiver All Necessary Authority to Protect the Interests of the On-Shore Creditors.*

Federal courts have broad discretion to appoint and select receivers and to shape the scope of the receiver's powers.  Wright & Miller, *supra*, § 2983.  The appointing court determines the specific powers granted the receiver within the limits imposed by 28 U.S.C.

§§ 754 and 959, the federal statutes applicable to receivers,[12] and the appointing court may grant a receiver powers that include the day-to-day management of the business entity, the authority to liquidate assets, and the authority to pursue claims. *See e.g. SEC v. Credit Bancorp, Ltd.* 297 F.3d 127, 130 (2d Cir. 2002) (recognizing a receiver's broad grant of power to issue subpoenas, marshal assets, liquidate those assets, and reinvest proceeds). Those powers may also include petitioning for bankruptcy under Chapter 11 if appropriate. *See In re Manhattan Inv. Fund, Ltd.*, 310 B.R. 500, 503 (Bankr. S.D.N.Y. 2002). Once the court appoints a receiver, he or she serves as an officer of the court and not as an agent of the plaintiff. *Federal Home Loan Mortgage Corp. v. Tsinos*, 854 F. Supp. 113, 115 (E.D.N.Y. 1994).

### a.    The Receiver Requires Broad Powers to Fulfill His Responsibilities.

The purpose of appointing a receiver is to identify the Bayou On-Shore creditors, investigate and evaluate the disposition of Bayou assets and the claims of the estates relating thereto, liquidate such claims as appropriate against third parties, and develop a plan to distribute the proceeds, including filing for bankruptcy if appropriate. *See generally* Proposed Receiver Order. The Committee's Proposed Order grants the receiver the necessary authority to complete such tasks. *See id.* at 2–7. More specifically, the receiver must have the authority to identify investors, initiate and settle litigation, make routine payments, invest claims proceeds pending distribution to maximize return, and develop a distribution plan. These are the types of tasks and powers that will be necessary to maximize any return to the defrauded investors.

---

[12] 28 U.S.C. § 959(b) requires the receiver to "manage and operate the property in his possession" as receiver in accordance with the laws of the state in which the property is located. Section 959(a) allows receivers to be sued for any acts done in the course of managing the receivership, and § 754 grants receivers jurisdiction over property located in other districts and the capacity to sue or be sued in any federal district court without requiring ancillary appointment.

b.    *The Proposed Receiver Will Not Interfere with Any Government Law Enforcement Interest.*

The Committee has carefully crafted its proposed order to avoid interference with the ongoing law enforcement activities of the government. The Bayou On-Shore assets that will be conveyed to the receiver are expressly defined to exclude any assets that are subject to an order of forfeiture. *See* Proposed Receiver Order at ¶ 4-6. To the extent that the receiver identifies additional Bayou assets that he believes properly belong to the Bayou On-Shore estates that are not subject to a forfeiture order, then the receiver must have authority to recover such assets. The alternative is to leave those assets in the hands of the admitted wrongdoers. To the extent that the government believes those additional assets are also deserving of forfeiture, then the government is free to commence additional proceedings relating to those assets.

Further, to carry out his responsibilities, the receiver must have the right to review and have access to all the books and records of the Bayou entities. The proposed order recognizes the government—which we understand has seized all such records—may assert a claim of privilege to some of those records. The Committee does not wish to interfere with the law enforcement objectives of such a seizure, but the records belong in equity to the creditors, not the government, and its receiver must have the right to access and review them under such terms and conditions as the Court may permit. The Committee expects that the receiver will cooperate with the government in this regard and burden the Court only to the limited extent necessary to permit him to perform his legitimate tasks.

c.    *This Court Should Approve the Committee's Requested Receiver.*

As detailed in the Fisher Declaration, the Committee undertook a rigorous process to identify, interview, and ultimately select an appropriate candidate for receiver. Fisher Dec. at ¶ 9. The Committee has selected its nominee unanimously after considering alternative

candidates in a meeting noticed to other interested creditors.  *Id.*  Mr. Marwil's resume demonstrates that he is qualified for the receiver position.

The Committee believes that the Court should defer to the Committee in its selection of a candidate for the proposed receiver.  Likewise, the Committee asks the Court to defer to its compensation judgment, which the Committee believes represents the results of an arms-length negotiation that provides the incentive for Mr. Marwil to vigorously represent the creditors' interests.  *See* Fisher Dec. at ¶ 10.[13]

---

[13] As to the amount of the receiver's performance bond, the Committee suggests this Court set no bond, or fix it at a nominal sum, and it be supplemented from time to time as appropriate upon further application of the Committee and the receiver, and by further order of this Court.

## IV.    CONCLUSION

For the forgoing reasons, the Committee requests this Court grant its requests: (1) that

Jeff J. Marwil, the Committee's nominee, be appointed as receiver; and (2) that the Court define

the scope of the receivership and the receiver's compensation in the manner set forth in the

Committee's proposed order.


Dated: New York, New York
         March 28, 2006

                                        KASOWITZ, BENSON, TORRES &
                                        FRIEDMAN LLP


                                        By: _____
                                            Joseph A. Gershman (JG-8275)
                                            Joshua S. Bauchner (JB-9106)
                                            1633 Broadway
                                            New York, New York 10019
                                            (212) 506-1700

                                        Attorneys for Plaintiff

                                        PRESTON GATES ELLIS
                                        & ROUVELAS MEEDS LLP
                                        Richard A. Kirby
                                        Philip M. Guess
                                        Scott Lindsay
                                        Joshua C. Gaul
                                        1735 New York Avenue, N.W., Suite 500
                                        Washington, D.C. 20006-5209
                                        Tel:  (202) 661-3730
                                        Fax: (202) 331-1024

                                        Counsel for Plaintiff